**Harry TOSCANO, Plaintiff,**

v.

**PGA TOUR, INC., et al., Defendants.**

**No. CIVS–97–1238 DFL PAN.**

United States District Court,
E.D. California.

Oct. 12, 1999.

Thomas August Casazza, Law Offices of Thomas Casazza, Sacramento, CA, for Harry Toscano, plaintiff.

Pamela J. Palmieri, Littler Mendelson, Sacramento, CA, William J. Maledon, Diane M. Johnson, Osborn Maledon, Phoenix, AZ, Cary M. Adams, Murphy Austin Adams Schoenfeld, LLP, Sacramento, CA, for Jim Colbert, Defendant.

William J. Maledon, Diane M. Johnson, Phoenix, AZ, Cary M. Adams, Murphy Austin Adams Schoenfeld, LLP, Sacramento, CA, for Bruce Devlin, Terry Dill, Dale Douglas, Raymond Floyd, Gibby Gilbert, Bob Goalby, Mike Hill, Ken Still, American Express Co., a New York corp., Ameritech Corp., a Delaware corp., Bank-Boston Corp., Banc One Corp., an Ohio corp., Country–Wide Credit Industries, Inc., a Delware corp., FHP Health Care, Franklin Quest Co., a Utah Corp., Hyatt Corp., LG Group, Paine Webber Group, Inc., a Delaware corp., Raley's, Ralph's Grocery Co., SBC Communications, Inc. a Delaware corp., The Scotts Co., an Ohio corp., TrueGreen–Chemlawn, PGA Tours, Inc., Dave Stockton, Deane R. Beman, Timothy W. Finchem, Defendants.

William J. Maledon, Diane M. Johnson, Phoenix, AZ, for Bellsouth Corp., a Georgia Corp., Defendent.

Will Barnett Fitton, Latham and Watkins, San Francisco, CA, William J. Maledon, Phoenix, AZ, Cary M. Adams, Murphy Austin Adams Schoenfeld, LLP, Sacramento, CA, William B. Slowey, General Motors Corp., Detroit, MI, for General Motors Corp., a Delaware corp.

Pamela J. Palmieri, Littler Mendelson, Sacramento, CA, William J. Maledon, Phoenix, AZ, Cary M. Adams, Murphy Austin Adams Schoenfeld, LLP, Sacramento, CA, for GTE Corp., a New York corp.

William J. Maledon, Phoenix, AZ, Cary M. Adams, Murphy Austin Adams Schoenfeld, LLP, Sacramento, CA, for Nationwide Ins. Enterprises, a Business Entity, Ojai Golf Charities, a California nonprofit corp., Centinela Hospital Medical Center, Defendants.

William J. Maledon, Diane M. Johnson, Phoenix, AZ, Cary M. Adams, Murphy Austin Adams Schoenfeld, LLP, Sacramento, CA, for Royal Carribean Cruise Line, Toshiba Corp., Transamerican Corp., a Delaware Corp., Gold Rush Classics, a California nonprofit corp., Classic Charities of Orange County, a California nonprofit corp., Grand Slam Charities, an Ohio nonprofit corp., Defendants.

## MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

Plaintiff Harry Toscano brings this action against the PGA Tour, Inc. ("the

Tour"), the individual officers and directors of the Tour, and various sponsors of the Tour's golf tournaments, alleging that they conspired to restrain trade in senior professional golf in violation of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1. The sponsor defendants move for summary judgment.

## I.

The Senior PGA Tour co-sponsors professional golf tournaments for players over the age of 50. (March 23, 1998 Mem. of Op. & Order at 1.) Toscano challenges the Tour's regulations governing (1) player eligibility, and (2) player participation in non-PGA events.

The Tour's Rules and Regulations provide for a 78–player field for each tournament. A player is exempt from having to compete in the qualifying rounds of the tournament if he has secured 75 or more victories in Senior PGA or PGA Tour events or is within any of the following categories: (1) the top 31 available players from the previous year's Tour Money List; (2) the top 31 available players from the All–Time Career Money List (which includes purses won both in Senior PGA Tour tournaments and in PGA tournaments); (3) the top eight players from the Tour's annual National Qualifying Tournament (in order of finishing); (4) players who have won a Tour tournament within the past 12 months; (5) the top four scorers in the qualifying round of play held before the tournament at issue; (6) four players designated by the tournament's local sponsor; and (7) on a space available basis, any otherwise non-exempt player who has won a Senior PGA Tour or PGA Tour tournament. (Moorhead Decl. ¶ 9; Pl.'s App. 1 at 5–9.)

The Rules and Regulations also restrict the ability of Tour members to participate in non-Tour events. Under the "Conflicting Events" Rule, a player who qualifies to play in a Tour event generally may not enter a non-Tour tournament scheduled on the same date unless he first obtains a written release from the Tour Commissioner.[1] (Pl.'s App. 1 at 25.) The Commissioner has discretionary authority to grant a Tour member two releases annually, assuming he participates in 15 Tour events, and an additional release for every five Tour events in which he participates above 15. (*Id.* at 26.) The Commissioner may deny a Tour member's request for a waiver if he determines that it "would cause [the] Tour to be in violation of a contractual commitment to a tournament or would otherwise significantly or unreasonably harm [the] Tour and such tournament." (*Id.*) Moreover, under the "Television Release" or "Media Rights" Rule, Tour members must also seek the Commissioner's approval before participating in a televised tournament that is not co-sponsored or approved by the Tour, irrespective of whether the tournament conflicts with a Tour event. (*Id.* at 27–28.)

The Rules and Regulations governing the Senior PGA Tour are controlled by the Tour's Division Board (the "Board"). (Pl.'s App. 1 at 48.) The Board is comprised of four Player Directors, the immediate past President of the PGA, and four Independent Directors, defined as "four public figures with a demonstrated interest in the game of golf." (*Id.* at 45.) Player Directors are elected by voting members of the Tour, and hold office for a period of two years. (*Id.*) Any amendment to the Rules and Regulations must be approved by a majority of the Board, including three Player Directors, unless a conflict of interest exists.[2] Amendments adopted by the

---

1. A member may enter a conflicting tournament if it is cosponsored or approved by the PGA, a major tournament such as the Masters or U.S. Open, the Ryder Cup tournament, a Nike Tour event (if the member meets certain qualifications), or, if the member is a foreign national, a golf event on his home circuit. (Pl.'s App. 1 at 25.)

2. If a Board member has a conflict of interest, a majority of the Board may vote to amend the Rules and Regulations "even if (i) such

Board may be reversed by a two-thirds vote of all voting members of the Tour.

Although no representative of the sponsor defendants is or has been a member of the Board, (Moorhouse Decl. ¶ 14), Toscano contends that the sponsor defendants conspired with the Tour to perpetuate and enforce the Rules and Regulations he challenges. Tour sponsors fall into two rough categories: "local sponsors" and "title sponsors." Local sponsors are nonprofit or charitable organizations that contract directly with the Tour. (*Id.* ¶ 3.) Local sponsors serve as the principal organizers of Tour events, and are responsible for reserving a golf course that meets Tour specifications, hiring and paying staff for the tournament, amassing the tournament prize money, advertising and promoting the event, and arranging for the sale of concessions. (*Id.* ¶ 4.) In order to cover the cost of organizing and operating the tournament, local sponsors in turn enter into agreements with title sponsors—businesses who pay for the right to advertise in connection with the tournament. (Moorhouse Decl. ¶ 5.) The local sponsor typically agrees to organize and conduct the tournament in accordance with PGA Rules and Regulations, incorporate the title sponsor's name into the Tournament title, display signage with the title sponsor's name at the tournament site, provide hospitality benefits at the tournament, and secure national television and print media advertising. (*E.g.,* Defs.' App. 7, 9, 10.) In return, the title sponsor generally makes payments under a fixed schedule, or assumes financial responsibility for a significant portion of the Tournament purse

and television and advertising costs.[3] (*Id.* 7, 8, 9, 10, 11.)

The organization of the Ralphs Senior Classic tournament illustrates the relationships among local sponsors, title sponsors, and the Tour. The local sponsor, defendant Centinela Hospital Medical Center ("Centinela"), entered into a contract directly with the PGA to organize and run a golf tournament in Los Angeles, California. The agreement provides that "[t]he general division of duties will be that [Centinela] will provide the course, the clubhouse, and all other facilities of every kind necessary or appropriate for professional golf competition, and PGA Tour, with the assistance of [Centinela], will conduct the competition." (Def.'s App. 3 at CH–00014.) Centinela in turn entered into a title sponsorship with Ralphs. In exchange for a series of payments to Centinela, Ralphs secured advertising and media rights in connection with the tournament, including the right to have its name included in the tournament's title (hence, "The Ralphs Senior Classic") and to use the tournament logo in its advertisements. (Def.'s App. 15 at RG–00054, 00060).

## II.

Section One of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. This phrase "has been interpreted to require concerted action of more than a single entity." *The Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148, 1152 (9th Cir.1988).

---

major[ity] is comprised of no Player Directors, and/or (ii) the disinterested directors constitute less than a majority of the Board, and provided further that if any Player Directors do not vote on such change, such majority shall include at least 75 percent of the Player Directors voting thereon." (Pl.'s App. 1 at 48.)

**3.** Defendant Royal Carribean Cruises, Ltd. served as both a local and title sponsor. (Def.'s App. 19.) Moreover, in addition to serving as a title sponsor for an individual

tournament (the "Cadillac–NFL Golf Classic"), General Motors paid for "umbrella sponsorship" rights to a series of telecasts of Tour events on ESPN. (Fitton Decl. Exs. B, C; Finchem Depo. at 94:11–23; Moorhouse Depo. at 71:22–25, 73:21–74:13). As an umbrella sponsor, GM was entitled to have its name presented as the overall series sponsor, a status distinct from the title sponsor of the individual tournaments comprising the series. (Fitton Decl. Ex.C at GM00000011.)

■ The Sponsor defendants argue that there is no triable issue of fact as to whether they and the Tour engaged in concerted anticompetitive action in violation of § 1.[4] Because the local sponsor defendants and title sponsor defendants have somewhat different relationships with the Tour, they are discussed separately below.

### A. Local Sponsors

■ Defendants maintain that under the Supreme Court's decision in *Monsanto v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the local sponsors' dealings with the Tour do not rise to the level of concerted action within the meaning of § 1. The court agrees.

In *Monsanto*, the Court affirmed the right of a manufacturer to announce the terms under which it will deal with distributors and then refuse to deal with those unwilling to accept its terms. The Court explained that a conspiracy between a manufacturer and its distributors could not be inferred from mere compliance by the distributors with the manufacturer's sales restrictions, since manufacturers often have independent reasons for imposing such restrictions. *See id.* at 762–63, 104 S.Ct. at 1470. For example, a manufacturer may "want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of the product, and will want to see that 'free riders' do not interfere." *Id.* at 762–63, 104 S.Ct. at 1470. Accordingly, before a plaintiff can establish concerted action between a manufacturer and its distributors under § 1,

"[t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* at 764, 104 S.Ct. at 1471. In particular, the plaintiff must advance evidence "that reasonably tends to prove that the manufacturer and others had a *conscious commitment to a common scheme* designed to achieve an unlawful objective." *Id.* at 764, 104 S.Ct. at 1471 (citation and internal quotations omitted) (emphasis added).

Defendants argue that *Monsanto* applies here because the relationship between the Tour and the local sponsors is analogous to that between a manufacturer and its distributors. According to defendants, the Tour unilaterally establishes its Rules and Regulations, and local sponsors merely acquiesce in those rules, much the same way a distributor acquiesces in terms announced by a manufacturer. Moreover, defendants point out that the interests of the Tour and the local sponsors do not necessarily coincide; even assuming that Toscano is correct in asserting that the Rules and Regulations are designed to qualify players with established PGA records and lock those players into the Tour, the Tour may have adopted this strategy to maximize the popularity of its tournaments, irrespective of the local sponsor's views about how the tournaments should be structured.

In response, Toscano contends that the following circumstantial evidence excludes the possibility of independent action by the Tour and the local sponsors: (1) contractual agreements between those parties; and (2) evidence that the local sponsors commented on the Tour's rules.

---

**4.** Defendants also maintain that summary judgment should be granted for title sponsors Franklin Covey Co. and Pacificare because Toscano was permitted to play in the tournaments sponsored by those defendants and therefore was not injured by them. To the extent, however, that a triable issue of fact exists as to whether Franklin Covey and Pacificare conspired with the Tour and the other sponsor defendants to maintain the rules challenged by Toscano, his claim continues as to these two defendants notwithstanding his participation in their tournaments. It is uncontroverted that the Rules and Regulations disqualified Toscano from participating in many other tournaments sponsored by the Tour.

### 1. Local Sponsorship Contracts

Toscano points out that the local sponsorship contracts make express reference to the provisions challenged by Toscano. For example, the sponsorship agreement between the Tour and defendant Centinela Hospital states:

> Sponsor and PGA Tour agree ... that PGA Tour will provide services for such competition in accordance with the provisions herein and with the Senior PGA Tour Tournament Regulations as they may from time to time apply, and which are incorporated herein by reference. ***
>
> PGA Tour will fill the field of contestants in accordance with the SENIOR PGA TOUR Tournament Regulations. ***
>
> Players eligible to apply to enter the Tournament shall be those prescribed in the Senior PGA Tour Tournament Regulations.

(Def.'s App. 3, at CH–00016, CH–00017, CH–00018.) This language does not, however, exclude the possibility of independent action or support a finding that the local sponsors and the Tour had a "conscious commitment" to a scheme to establish and perpetuate the Rules and Regulations. The agreements merely obligate the Tour to run its tournaments in accordance with its own rules; they in no way suggest that the local sponsors have any influence or exert any control over the rules themselves or did anything other than to accede to the Tour's natural desire to run its tournaments according to its rules.

Toscano counters that the mere existence of contracts between the Tour and its local sponsors suffices to satisfy the concerted action requirement of § 1. But whether a contract alone gives rise to an inference of concerted action depends upon the nature of the anticompetitive conduct alleged by plaintiff. *Cf.* VII Philip E. Areeda, *Antitrust Law* ¶ 1400 at 5 (1986) (observing that "if the reasons for prohibiting or controlling certain conduct are very strong, it makes sense to err on the side of overinclusiveness in determining the presence of an agreement"). Toscano's § 1 claim is based upon a vertical boycott theory. He alleges that the Tour conspired with certain of its officers, the Player Directors, and the sponsors to boycott Toscano and similarly situated players from participating in the market for senior professional golf. None of these categories of defendants competes with each other, and each plays a different role in the conspiracy theory advanced by Toscano.[5] Because "precedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct·competitors," *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998), Toscano's claim must be analyzed under the Rule of Reason.

■■■ The Rule of Reason governs a wide array of conduct that requires cooperation and may be as likely to promote competition as it is to suppress it. *See e.g., Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188 (7th Cir.1985) (Easterbrook, J.) (observing that "[j]oint ventures, mergers, systems of distribution—all these and more require extensive cooperation, and all are assessed under a Rule of Reason"). Because contracts are often used to regulate relationships among cooperating entities, a rule equating the

---

**5.** As Toscano explains in his brief:

> [E]very fact of the combination complained of has financial gain written all over it. The Tour wants to continue to build its empire of golf-related businesses. The Tour's members (including the Player Directors) want to keep earning money playing golf, making appearances, giving endorsements, and even designing golf courses. The local sponsors need to be able to sell sponsorship packages to the title sponsors in order to continue operating ... The title sponsors want to further relationships with their major clients, promote employee loyalty, and sell their products and services without having to compete with like-image products to reach their target markets.

(Pls.' Am. Opp'n to Defs.' Mot.S.J. at 40.)

mere existence of a contract with concerted action in Rule of Reason cases would create a significant risk of deterring procompetitive behavior. *Cf. Monsanto,* 465 U.S. at 763, 104 S.Ct. at 1470 (warning that inferring concerted action from conduct consistent with independent action "could deter or penalize perfectly legitimate conduct"). Accordingly, the courts have held that where the conduct challenged by the plaintiff is subject to Rule of Reason analysis, the existence of a contract between a party who announces his terms and a party who acquiesces in them does not, without more, give rise to an inference of concerted action under § 1. *See Matrix Essentials v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 594 (5th Cir. 1993) (rejecting the defendant's § 1 defense despite the existence of a contract between the plaintiff manufacturer and its distributors in which the plaintiff unilaterally established the non-price restraint challenged by the defendant); *American Airlines v. Christensen,* 967 F.2d 410, 413 (10th Cir.1992) (concluding that contracts between the defendant airline and members of its travel awards program raised no triable issue of fact as to concerted action where "[n]o evidence in the record suggest[ed] that [the airline] did not independently set the terms under which it would offer its travel awards"); *see also Beutler Sheetmetal Works v. McMorgan & Co.,* 616 F.Supp. 453, 454–56 (N.D.Cal. 1985) (finding no triable issue of fact as to whether the defendant lender and its borrowers engaged in concerted action where the borrowers acquiesced in terms announced by the lender and incorporated in the latter's commitment letters).[6]

If the contract between the Tour and the local sponsors sufficed to make the latter co-conspirators under § 1, any party, however small, would risk antitrust liability based upon the Tour's conduct simply by contracting with the Tour to do business at a typical Tour event run according to Tour rules. Antitrust liability would potentially extend to sidewalk vendors, limousine services, local businesses seeking advertising—any business, however far removed from the market for professional golf, that happened to enter into such an agreement with the Tour. Because this result would be inconsistent with the purpose of the Sherman Act,[7] Toscano

6. Where the challenged conduct raises strong antitrust suspicions and is therefore per se illegal, a contract may satisfy the concerted action requirement even if one of the parties was coerced into the agreement. For example, a sales contract alone may give rise to an inference of concerted action under § 1 if the agreement was part of a tying arrangement. *See Datagate, Inc. v. Hewlett–Packard Co.,* 60 F.3d 1421, 1427 (9th Cir.1995) (explaining that § 1's concerted action requirement "is satisfied in tie-in cases by the coerced sales contract for the tied item") (emphasis omitted); *Systemcare, Inc. v. Wang Labs. Corp.,* 117 F.3d 1137, 1142 (10th Cir.1997) (holding that "a contract between a buyer and seller satisfies the concerted action element of section 1 of the Sherman Act where the seller coerces a buyer's acquiescence in a tying agreement imposed by the seller"). In cases involving restraints that are per se illegal, it "makes sense to err on the side of over-inclusiveness in determining the presence of an agreement," VII Areeda, *supra,* ¶ 1437 at 5, because the restraints "pose an unacceptable risk of stifling competition", *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 9, 104 S.Ct. 1551, 1556, 80 L.Ed.2d 2 (1984); *cf. NYNEX,* 119 S.Ct. at 497 (observing that "certain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstance"). As explained above, however, this case does not involve allegations of tying or other conduct subject to the per se rule.

7. Defendants also cite to *Acquaire v. Canada Dry Bottling Co.,* 24 F.3d 401 (2d Cir.1994), *Precision Piping & Instruments, Inc. v. E.I. duPont de Nemours & Co.,* 951 F.2d 613 (4th Cir.1991), *49er Chevrolet, Inc. v. General Motors Corp.,* 803 F.2d 1463 (9th Cir.1986), and *Smilecare Dental Group v. Delta Dental Plan of Cal., Inc.,* 88 F.3d 780 (9th Cir.1996). Each of these cases is distinguishable. *Smilecare* is a § 2 case, and the plaintiff alleged no agreement in restraint of trade. *See* 88 F.3d at 786 (holding that the plaintiff's "failure to allege the essential element of conspiracy between [the defendant] and any other parties precludes a group boycott claim"). While

must, under *Monsanto*, come forward with additional evidence excluding the possibility of independent action and suggesting that the Tour and the local sponsors "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471 (citation and internal quotations omitted).

### 2. *Notice and Comment Procedure*

Toscano also points out that before the Tour's Board takes a final vote on amendments to the Rules and Regulations, it oversees a notice-and-comment procedure in which both local and title sponsors may participate. According to Toscano, the sponsors use this process to influence and shape the rules.

There is little support in the record for this contention. It is undisputed that no representative of the sponsor defendants has ever sat on the Board. The testimony of PGA Tour Commissioner Timothy Finchem, on which Toscano heavily relies, suggests that the decision to adopt or amend the Rules and Regulations rests ultimately with the Board. Finchem testified that there is "a period of time where the sponsors—the tournaments can have impact and access to various members of the board to write memos stating their position or orally make their position known to players who are on the Player Advisory Council or player directors or independent directors or whatever." (Finchem Depo. at 78:1–8.) But he also made clear that "[s]ometimes [the sponsor's] position is one that the board eventually

agreed with and sometimes it doesn't." (*Id.* at 79:12–13.)

Evidence that the local sponsors sporadically participated in the Tour's notice and comment procedures does not reasonably exclude the possibility of independent action. In the analogous context of manufacturer-distributor relationships, the courts have uniformly held that concerted action between manufacturers and distributors may not be inferred from mere evidence that the manufacturer considered complaints from distributors before enforcing its sales rules against a wayward distributor. *See Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470 (explaining that distributor complaints "arise in the normal course of business and do not indicate illegal concerted action") (citation and internal quotations omitted); *O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1468 (9th Cir. 1986) (holding that "[dealer] complaints followed by termination are not enough to provide sufficient proof of an antitrust conspiracy"); *The Jeanery*, 849 F.2d at 1157 ("Complaints by competitors, standing alone, are not sufficient to show a conspiracy."); *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1162 (7th Cir.1987) (Posner, J.) ("Complaints to a supplier, made by competitors of a dealer who is cutting prices below suggested levels are not, standing alone, evidence of agreement"). Moreover, there is no evidence that any of the sponsor defendants commented on the particular rules challenged by Toscano.[8] The mere possibility that a local sponsor could advocate for or against a rule is not sufficient by itself to support a finding that

*Acquaire* involved an allegedly anticompetitive agreement between a manufacturer and distributor, the policy challenged by the plaintiff in that case was not set forth in a written agreement. *See* 24 F.3d at 407–08. The same is true of *49er Chevrolet*, 803 F.2d at 1467 (finding no agreement under § 1 between the defendant auto-manufacturer and its shippers where the alleged anticompetitive contracts made no reference to the challenged policies regarding dealer reimbursement for damaged cars), and *Precision Piping*, 951 F.2d at 615–18 (finding no agreement within the meaning of § 1 where the alleged antitrust

conspirators had no written agreement and there was no evidence that the defendants collaborated on the policy challenged by plaintiff).

8. Indeed, the evidence in the record suggests that many local sponsors never commented to the Tour about its Rules and Regulations. ((Centinela Hosp. Rep.) Peterson Depo. at 24:17–25:4; (Grand Slam Charities Rep.) Kramer Depo. at 67:22–68:11; (Gold Rush Classics Rep.) Bell Depo. at 35:19–25.)

the Tour and the local sponsors reached common objectives concerning eligibility requirements.

### 3. The Record as a Whole

To avoid summary judgment, Toscano must present evidence showing "that the hypothesis of collusive action [i]s more plausible than that of individual action." *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 785 (7th Cir.1999) (Posner, C.J.); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) (explaining that a plaintiff asserting a § 1 claim "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [him]"). As noted above, however, the record lacks concrete evidence that the local sponsors held specific views about the Rules and Regulations targeted by Toscano, that those views, if any, were communicated to the Tour, and that the Tour relied on these putative views in adopting or amending its rules.[9] It is equally if not more reasonable to infer from the record that the Tour and local sponsors acted independently with respect to the challenged rules.

According to Toscano, the Tour's eligibility and participation requirements are intended to capture golfers who have met with previous success on the Tour "to the exclusion of equally or better qualified individuals." However, the local sponsors might very well be indifferent as to whether the Tour focuses on players with a history of winning or players with the best ability, so long as the Tour's events draw public attention sufficient to further the local sponsors' fundraising objectives. Nor are the local sponsors' interests clearly aligned with the Tour's interest in the Conflicting Event and Television Release rules. Toscano maintains that these rules are designed to prevent competing leagues from springing up. But the local sponsors could well benefit from a market with competing leagues in which they might be able to negotiate more favorable terms with the Tour and have greater choice.[10]

Because "the evidence is consistent with the hypothesis that the [entity] at the top of the vertical chain designed the [challenged] restrictions for its own purposes, an inference of conspiracy is inappropri-

---

**9.** Toscano invokes *Volvo North Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55 (2d Cir.1988), but, as the defendants point out, that case is distinguishable. In *Volvo*, a former sponsor of a men's professional tennis tour brought a § 1 claim against the tour, asserting that it conspired with other sponsors and tournament operators (not named as defendants) to prevent the plaintiff from sponsoring future tour events. Although the decision dealt principally with the issue of antitrust standing, *see id.* at 66–70, the court went on to hold that the plaintiff adequately alleged a conspiracy within the meaning of § 1, *see id.* at 70–71. The court explained that "[c]ourts have consistently held that, since joint ventures—including sports leagues and other such associations—consist of multiple entities, they can violate § 1 of the Sherman Act." *Id.* In the court's view, the tour was no different from these defendants, since it consisted of "representatives of national tennis associations, tournament owners and directors, and professional tennis players." *Id.* at 71.

Because no sponsors were sued in *Volvo*, the decision does not discuss the circumstances in which the sponsors of a sports league may be held liable under § 1 as co-conspirators of the league. Moreover, unlike the professional tennis tour at issue in *Volvo*, the Tour is not a joint venture, and the Tour's Board does not include representatives of sponsors hosting tournaments. *See id.* at 58, 67, 71.

**10.** The economic evidence advanced by Toscano is conclusory and unpersuasive. According to Toscano's expert, Dr. Tollison, "[t]he economic theory explaining why the local tournament sponsors are involved in the anticompetitive combination in this case is simply that they contractually bind themselves to, and benefit from, the very aspects of the Senior PGA Tour's operation that are anticompetitive." (Tollison Decl. at 15.) Tollison's declaration fails to explain, however, why the local sponsors have an economic interest in the eligibility and participation rules challenged by Toscano.

ate." *Illinois Corp. Travel, Inc. v. American Airlines, Inc.,* 806 F.2d 722, 726 (7th Cir.1986) (Easterbrook, J.). Accordingly, the local sponsors are entitled to summary judgment.

### B. Title Sponsors

 Toscano's § 1 claim against the title sponsor defendants is even weaker than his claim against the local sponsors. Unlike the local sponsors, the title sponsors do not contract directly with the Tour.[11] And, as discussed above, Toscano has submitted no evidence showing that any of the sponsor defendants commented specifically on the rules he challenges.

Toscano correctly points out that a GM representative testified in his deposition that "the possibility that someone from General Motors commented on the regulations at one time in the nine-year history is likely." (Comb Depo. at 47:20–24.) In addition, Commissioner Finchem stated in his deposition that GM, like any sponsor, would be able to comment on the Rules and Regulations as part of the notice and comment period preceding a vote by the Tour's Board:

> Question: If, in fact, you portend [sic] to make changes to the regulations, would Cadillac have the ability to comment upon same?

> Answer: Yes, we would treat Cadillac in that context in the same way we would treat any of the title sponsors or the tournament or-

ganizations. We would ask for their comments.

(Finchem Depo. at 11–17.) As explained above, however, evidence that a sponsor commented on the Rules and Regulations is consistent with independent decision making by the Board, and does not alone give rise to a reasonable inference of concerted action.[12] Moreover, there is no evidence that GM or any other title sponsor directed any comments to the particular rules that Toscano attacks as anti-competitive.

Because Toscano has failed to present evidence "show[ing] that the inference of conspiracy is reasonable in light of the competing inference[ ] of independent action," *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356, the title sponsor defendants are entitled to summary judgment.

The sponsor defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

---

**11.** Because Carribean Cruise Lines acted as a local sponsor as well as a title sponsor, the analysis applicable to local sponsors applies equally to it. GM's situation differs from that of the other title sponsors because it contracted directly with the Tour to act as an umbrella sponsor for a series of tour events. However, neither of the two umbrella sponsorship agreements between the Tour and GM refers to the Tour's Rules and Regulations. (Fitton Decl.Ex. D; Fitton Decl.Ex. E.)

**12.** Toscano also cites as specific circumstantial evidence of concerted action among the defendants the fact that officers of title spon-

sor Pacificare served on the board of a local sponsor, whose other directors in turn were representative of other sponsors. According to Toscano, one of Pacificare's officers was also President of the local sponsor, and "participated at an organizational board meeting where the topics of discussion included the agreements necessary to be entered into with the Tour." (Pls.' Am. Opp'n to Defs.' Mot. for S.J. at 26.) Even assuming the truth of these assertions, however, they do not support an inference of concerted action between Pacificare and the Tour to establish and perpetuate the Rules and Regulations.