Paul **LUCAS** dba **Solar Engineering and Contracting, Plaintiff,**

v.

**CITIZENS COMMUNICATIONS COMPANY, a Delaware profit corporation, F.K.A. Citizens Utility Company and dba Kauai Electric, and Kauai Island Utility Cooperative, a Hawaii Cooperative, Defendants.**

No. CIV. 03–00295 HG–LEK.

United States District Court, D. Hawai'i.

Nov. 15, 2005.

---

David J. Gierlach, Honolulu, for Paul Lucas, Plaintiff.

Stacey T. Kawasaki–Djou, Cades Schutte, Honolulu, for Citizens Communications Company, Defendant.

Kaiulani E. Kidani, Marr Hipp Jones & Wang LLLP, Honolulu, for Citizens Communications Company, Leonard Tow, Defendants.

Gary M. Levitt, Attorney at Law, Honolulu, for Paul Lucas, Plaintiff.

Jeffrey S. Portnoy, Cades Schutte, Honolulu, for Citizens Communications Company, Leonard Tow, Defendants.

David W. Proudfoot, Belles Graham Proudfoot & Wilson, Lihue, for Kauai Island Utility Cooperative, Alton Miyamoto, Greg Gardiner, Ray Mierta, Defendants.

Pamela P. Rask, Belles Graham Proudfoot & Wilson, Lihue, for Kauai Island Utility Cooperative, Alton Miyamoto, Greg Gardiner, Ray Mierta, Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GILLMOR, Chief Judge.

Plaintiff alleges that Defendants' practice of imposing maximum price restrictions in its rebate program for the installation of solar water heaters on the island of Kauai violates state and federal antitrust law. Plaintiff also alleges a cause of action for defamation. Defendants have moved for summary judgment on all claims.

For the reasons set forth below, Defendants are entitled to summary judgment on the federal and state antitrust claims and the defamation claim. Defendants' Motion for Summary Judgment is GRANTED.

### PROCEDURAL HISTORY

On June 13, 2003, Plaintiff filed a complaint pro se.

On October 22, 2003, the Court issued an order granting in part and denying in part Defendants' Motion to Dismiss the complaint.

On November 21, 2003, Plaintiff, through counsel, filed an amended complaint.

On May 4, 2005, Defendant Kauai Island Utility Cooperative ("KIUC") filed a motion for summary judgment.

On May 9, 2005, Defendant Citizens Communications Company ("Citizens") joined in Defendant KIUC's Motion for Summary Judgment.

On May 9, 2005, Defendant KIUC filed errata to its Motion.

On August 4, 2005, Plaintiff filed a memorandum in opposition to Defendant KIUC's Motion for Summary Judgment and the declaration of Paul Lucas.

On August 11, 2005, Defendant KIUC filed a reply.

On August 11, 2005, Defendant Citizens filed a reply.

### BACKGROUND FACTS

Defendant Citizens, doing business as Kauai Electric on the island of Kauai, was formerly the provider of electricity on Kauai. On November 1, 2002, KIUC acquired all the assets of Kauai Electric from Citizens. (Def.'s Concise Statement ¶ 5; Pl.'s Concise Statement ¶ 5.)

Plaintiff Paul Lucas, doing business as Solar Engineering and Contracting, sells and installs solar water heaters on the island of Kauai. Plaintiff has been selling and installing solar water heaters for over 20 years. (Lucas Decl. ¶ 3.)

On December 1, 1994, Citizens filed an application with the Public Utilities Commission of the State of Hawaii for approval of six demand-side management, or energy conservation, programs. (Def. KIUC's Mot. for Summ. J., Ex. A, Decision and Order of Hawaii Public Utilities Commission, filed August 5, 1997, ("PUC Order") at 1.) The purpose of the demand-side management programs is to increase energy efficiency, decrease energy demand, and postpone the need for the construction of new energy generating facilities. The Public Utilities Commission approved the six programs in an order dated August 5, 1997.

One of the demand-side management programs was the Residential Retrofit Program which addressed the installation of energy saving devices such as solar water heaters in existing homes. (Id. at 6.) Another program, the Residential Direct Install Program, was directed toward low income and rental residences. (Id. at 7.) Yet another program, the Residential New Construction Program, involved the installation of energy efficient technologies in new residential construction. (Id. at 8.)

These three residential demand-side management programs provided incentives to home-owners to purchase and install solar water heaters in their homes. The primary incentives were rebates and financing at low rates of interest. (Id. at 7–8.) Under the programs, Citizens was to offer rebates of as much as 70–percent of the cost of the solar water heaters installed in single-family homes. (Id.)

The Public Utilities Commission allowed Citizens to recover the cost of administering the program, the cost of the rebates,

and its lost profit due to lower revenues from the reduced energy demand through a surcharge imposed on all rate payers. (Id. at 9–10 and 27.) In other words, the program was designed to have no effect on Citizens' profitability, no matter how many or how few solar water heaters were installed on Kauai. The Commission's order also provided for annual review and reporting of the cost-effectiveness of the demand-side management programs. (Id. at 26.)

Citizens marketed the demand-side management programs on Kauai as the Energy Wise Program. Citizens developed a procedure for approving rebates for the installation of solar water heaters only through approved contractors who had signed an agreement to participate in the Energy Wise Program. (KIUC's Reply Memo., Ex. B "A Contractor's Guide to the Solar & Heat Pump Rebate Process", at 1494–97.)

Citizens conducted an independent evaluation of each home for which a rebate application was submitted to determine how much energy would be saved by the installation of a solar water heater. Based on the evaluation, Citizens would set a price above which Citizens would not pay a rebate. (Id. at 1491, 1493–97.) The price was determined by the amount of energy that the installation of a solar water heater would save. (Id. at 1494.) Citizens would only give rebates in situations where the energy savings would justify the cost. Certain applicants were denied participation in the program because Citizens believed the installation of a solar water heater would not be cost effective. Citizens sometimes set different maximum prices for solar water heaters in different homes because the energy savings for each home were different. For example, in a home where the energy savings were greater, Citizens would approve a higher

purchase price for a water heater. As a result, two homeowners could pay different maximum prices for the same equipment and receive different rebates. (*Id.;* Pl.'s Concise Statement, Ex. E.)

In 1998, Plaintiff became an approved contractor for the Energy Wise Program on Kauai. In 2000, Plaintiff was terminated as an approved contractor for attempting to charge customers more than the maximum price established by Citizens. (Lucas Decl. ¶ 24.) Plaintiff claims he was unable to profit from installing water heaters as Citizen "fixed" the price of solar water heaters too low for him to profitably sell them to customers approved for the rebate. (*Id.* at ¶¶ 12, 13.)

Plaintiff has alleged price-fixing and monopolization pursuant to Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. Plaintiff argues that Citizens, and later KIUC, had unlawful motives in applying for approval for the solar water heater rebate program in 1994, and in administering it since 1998. Plaintiff contends that Defendants did not truly desire to reduce electricity consumption on Kauai through the proliferation of low-cost solar water heaters. Plaintiff claims Defendants actually intended to increase electricity consumption by maintaining an artificially low price for solar water heaters, which would drive solar water heater sellers out of business, and limit the spread of the heaters on Kauai. Plaintiff essentially claims that the Defendants operated the Energy Wise Program to injure competition in the solar energy installation market.

### EVIDENTIARY OBJECTIONS

#### A. Plaintiff's Objections

Plaintiff objects to the authenticity of the August 5, 1997 Decision and Order of the Hawaii Public Utilities Commission, which Plaintiff contends is authenticated only by the declaration of counsel for De-fendant KIUC. Plaintiff objects to the Declaration of Ray Mierta as it is unsigned. Plaintiff argues that "the Court may properly deny Defendant's Motion solely for its lack of admissible evidence."

Plaintiff's evidentiary objections are overruled.

The August 5, 1997 Decision and Order need not be authenticated at summary judgment as long as the Court is satisfied that it is capable of being authenticated at trial. *Fraser v. Goodale,* 342 F.3d 1032, 1036–37 (9th Cir.2003), *cert. denied* 541 U.S. 937, 124 S.Ct. 1663, 158 L.Ed.2d 358 (2004); *Fonseca v. Sysco Food Serv. of Ariz., Inc.,* 374 F.3d 840, 846 (9th Cir. 2004). The Decision and Order is a public document likely to be easily authenticated at trial. Plaintiff has also submitted portions of the August 5, 1997 Decision and Order as an exhibit to his concise statement of facts in opposition to summary judgment. (Pl.'s Concise Statement, Ex. D.)

The Declaration of Ray Mierta is admissible. The declaration submitted on May 4, 2005 is unsigned, but Defendant KIUC followed up by filing a signed declaration on May 9, 2005.

#### B. Defendant KIUC's Objections

Defendant objects to several affidavits attached to Plaintiff's Concise Statement of Facts and asks the Court to disregard the exhibits.

#### Objection 1: Affidavit of Marc Anthony

Defendant KIUC objects to the Affidavit of Marc Anthony based on Fed.R.Civ.P. 56(e), which provides that assertions of fact must be in a form admissible into evidence. (Pl.'s Concise Statement, Ex. 2.) Marc Anthony states that he is the president of Pacific Solar, one of the largest solar water heating companies in the state.

Defendant KIUC objects to the affidavit as it refers to the Energy Wise Program as engaging in price-fixing, which KIUC argues is a legal conclusion. KIUC also argues that Anthony's claim that it would not be profitable for his company to participate in the program is an inadmissible opinion.

The affidavit is admissible. Anthony's reference to "price-fixing" can be treated as a lay manner of describing the rebate price restriction and not a legal conclusion. Anthony's testimony that it would not be profitable for his company to participate is admissible as opinion based upon his experience in the market. Fed.R.Evid. 701.

### Objection 2: Affidavit of Rolf Chris

The Court will not disregard the statements in the Affidavit of Rolf Christ (Pl.'s Concise Statement, Ex. 3) which are subject to a similar objection. Chris is the president of a company that supplies and manufactures solar water heating equipment. He has been involved in the development of demand-side management programs for the islands of Oahu, Maui, and Hawaii. Chris' affidavit is admissible based on his experience. Fed.R.Evid. 701. It is likely that proper foundation could be laid at trial. *Fraser*, 342 F.3d at 1036–37; *Fonseca*, 374 F.3d at 846.

### Objection 3: Affidavit of Raymond and Eugenia Chuan

One of the theories advanced by Plaintiff is that there was a manipulation of the rebate program by Citizens which affected the sale price of the utility from Citizens to Kauai Electric in 2002. (Pl.'s Concise Statement, Ex. 4.) Affiants Raymond and Eugenia Chuan are individual owners of two residential properties on Kauai. Affiants state that the sale price of Kauai Electric in 2002 would have been negatively impacted by the spread of solar water heaters on Kauai and that Citizens suppressed the program. The opinion evidence concerning the sale price of Kauai Electric will not be considered because of lack of proper foundation. Fed.R.Evid. 701. Plaintiff is unlikely to demonstrate at trial that Plaintiffs are qualified to testify as to their opinions on the sale price of Kauai Electric. The testimony is also irrelevant to the issues raised in the Complaint. The remaining portions of the affidavit, however, will not be disregarded.

### Objection 4: Affidavit of Beatrice Ditmars

Ditmars is a home-owner on Kauai. Ditmars' affidavit describes how Citizens refused to allow her to participate in the rebate program. (Pl's Concise Statement, Ex. 5.) KIUC objects to the relevance of the affidavit. The affidavit demonstrates that some residential homeowners were denied participation in the program and is relevant as to how the program actually operated relative to the ultimate issues of monopolization and price fixing. The Court will consider the affidavit.

### Objection 5. Affidavit of Charles E. Lanphier

Lanphier is a home-owner on Kauai. He states in his affidavit that he believes the solar water heater rebate program on Kauai "was patently designed to fail." (Pl.'s Concise Statement, Ex. 6.) KIUC objects to such statements on the ground that it is an inadmissible lay opinion for which Plaintiff is unlikely to establish a foundation at trial. Fed.R.Evid. 701. KIUC's objection is sustained. The remainder of the affidavit, however, will not be disregarded.

### Objection 6: Affidavit of Mark Svoboda

The affidavit of Mark Svoboda (Pl.'s Concise Statement, Ex. 9) will not be disregarded. Affiant is an employee of Plain-

tiff. Plaintiff is likely to be able to reduce the information contained in the affidavit to a form that is admissible at trial. *Fraser*, 342 F.3d at 1036–37; *Fonseca*, 374 F.3d at 846.

### Objection 7: Affidavit of James C. Madison

The affidavit of James C. Madison (Pl.'s Concise Statement, Ex. 10) will not be disregarded. Affiant is a carpenter and a home-owner on Kauai. Defendant KIUC's objection is based upon relevance. The statements are relevant as to whether Plaintiff lost customers due to the alleged price-fixing conspiracy.

### Objection 8: Declaration of Plaintiff Paul Lucas

The Court will not disregard the declaration of Paul Lucas (Pl.'s Concise Statement, Ex. 1) or the exhibits to the Lucas Declaration to which KIUC objects. The exhibits are all relevant to Plaintiff's claims and are all capable of being authenticated with proper foundation at trial through the testimony of Plaintiff or other witnesses.

### Objection 9: Declarations of Jai Roberts, Aurelio Dumbrique, Stephanie Rogers, and Walter Lewis

The Declaration of Walter Lewis (Pl.'s Concise Statement, Ex. 12) will be disregarded. Walter Lewis is a resident of Kauai and a retired lawyer. He opines that a $270 million sale price for Kauai Electric was "excessive," and a $215 million sale price was "still unreasonable." His opinion purports to be based on technical or specialized knowledge, regarding the value of electrical companies.

Assuming, arguendo, that Walter Lewis could be qualified as an expert as to the effect promoting or suppressing the rebate program would have had on the purchase price of the sale of the utility from Citizens to KIUC in 2002, that fact would have no relevance to the claims raised by the Complaint. As to any impropriety in the price itself, Plaintiff does not have standing to raise the claims of injury based upon any impropriety in the 2002 transaction between Citizens and KIUC.

Declarants Jai Roberts, Aurelio Dumbrique, and Stephanie Rogers are homeowners on Kauai. (Pl.'s Concise Statement, Ex.'s 7, 8, 11) Their Declarations are relevant and are capable of being reduced to an admissible form at trial. Exhibits 7, 8, and 11 will not be disregarded.

### *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). To defeat a motion for summary judgment, there must be sufficient evidence upon which a reasonable jury could return a verdict for the nonmoving party. *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916 (9th Cir.1996).

The moving party has the initial burden of "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The moving party, however, has no burden to provide any evidence or otherwise negate or disprove matters on which the opponent will have the burden of proof at trial. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The moving party must show, however, that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. That burden is met by demonstrating that there is an

absence of evidence to support the non-movant's case. *Id.*

If the moving party meets its initial burden, then the opposing party may not defeat a motion for summary judgment in the absence of probative evidence tending to support its legal theory. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir.1979). The burden on the opposing party is to present admissible evidence showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Nidds,* 113 F.3d at 916 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The court must view the evidence in the light most favorable to the non-moving party. *State Farm Fire & Casualty Co. v. Martin,* 872 F.2d 319, 320 (9th Cir.1989).

Opposition evidence may consist of declarations, admissions, evidence obtained through discovery, and matters judicially noticed. Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The opposing party cannot, however, stand on its pleadings or simply assert that it will be able to discredit the movant's evidence at trial. Fed.R.Civ.P. 56(e); *T.W. Elec. Serv.,* 809 F.2d at 630. The opposing party cannot rest on mere allegations or denials. Fed. R.Civ.P. 56(e); *Gasaway v. Northwestern Mut. Life Ins. Co.,* 26 F.3d 957, 959–60 (9th Cir.1994). Nor can the opposing party rest on conclusory statements. *National Steel Corp. v. Golden Eagle Ins. Co.,* 121 F.3d 496, 502 (9th Cir.1997).

### SUMMARY JUDGMENT IN ANTITRUST CASES: THE MATSUSHITA FACTORS

Before reaching a discussion of the substantive law applicable to Plaintiff's claims, it is useful to examine the inferences which may be drawn from the empirical facts as they relate to Plaintiff's antitrust theories.

Injury to competition is a conclusion having legal and factual components; these conclusions are reached by the process of drawing inferences. Plaintiffs in antitrust cases have the burden of proof as to every element of their claim, both at trial and at summary judgment. Where the claim is implausible or makes no economic sense, the Plaintiff has not met the burden. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where the claim appears to be implausible, the plaintiff "must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Id., Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987). A jury may not infer the existence of a conspiracy where "the claim makes no economic sense." *Richards,* 810 F.2d at 902.

The issue on appeal in *Matsushita* was whether the plaintiffs had raised a genuine issue of material fact as to the existence of a conspiracy. The Supreme Court found that the plaintiffs' theory of a predatory price-fixing conspiracy was economically implausible and the plaintiffs had no "sufficiently unambiguous" evidence of a conspiracy. *Id.* at 597–98, 106 S.Ct. 1348. The Supreme Court reasoned that it would not make economic sense for companies to conspire over the course of twenty years to charge artificially low prices at a loss in the hopes that they could later charge prices high enough to both recoup the losses and earn excess profits. *Id.* at 590–92, 106 S.Ct. 1348.

The *Matsushita* standard requiring "sufficiently unambiguous" evidence applies in the present case as Plaintiff's theory as to the purpose, intent, and economic

effect of the Energy Wise Program makes no economic sense for several reasons.

The *Matsushita* standard has been interpreted as simply an extension of the normal summary judgment standard rather than a "heightened" standard. *See R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 58 (2nd Cir.1997); *McLaughlin v. Liu,* 849 F.2d 1205, 1207 (9th Cir.1988). If a plaintiff's claim that there is a conspiracy is unreasonable on its face, no reasonable jury could infer a conspiracy from circumstantial evidence. Persuasive direct evidence is necessary for the plaintiff to survive summary judgment.

Plaintiff maintains that Defendants operated the Energy Wise Program to increase electric energy consumption by maintaining artificially low prices for solar hot water heaters in order to drive solar hot water heater installers out of business, thereby injuring competition in the energy market shared by Defendants, the Plaintiff and other sellers of alternate energy devices. The problem, however, is that once we get beyond Plaintiff's arguments and conclusory statements there is little, if anything, to support these theories.

The first consideration in the process of inference drawing to reach the ultimate conclusions regarding purpose, intent and effect on competition is that this case arises in an artificial universe created by the Public Utilities Commission order ("PUC order").

The Public Utilities Commission order essentially distorts normal assumptions regarding purpose, intent and effect on competition. Garden variety notions of economic motivation are turned on their respective heads.

The basic facts of the Energy Wise Program are not in dispute: regardless of how many or how few solar hot water heaters are installed under the program, the economic "bottom line" for Defendants remains the same; they neither lose nor make more money. It is this "bottom line" neutrality that is relevant to show purpose and intent to achieve an unlawful result. As for an energy market shared by conventional electric energy generators, on the one hand, and Plaintiff Lucas and the other solar energy sellers on the other, the program does create an artificial market situation. One major aspect of the artificiality is the distortion of Defendants' economic motivation. Before the Energy Wise Program existed, solar hot water heaters were sold and installed on Kauai by Plaintiff Lucas and others. The program can be said to have created a distortion of the market in favor of Plaintiff Lucas and the other installers, even if it produced only one additional installation of a solar energy device in the market. Plaintiff Lucas' claim then becomes: the Energy Wise Program violates the antitrust laws because it does not spin off a sufficient amount of economic benefit to solar energy device installers to provide a benefit to him. Since the gravamen of an antitrust violation is not injury to a particular competitor, but injury to the competitive process itself, the first inference to be drawn from the empirical facts here is that there was no purpose or intent to injure the competitive process.

Plaintiff's specific arguments regarding Defendants' intent to destroy competition in the solar water heater market on Kauai are far-fetched. According to Plaintiff, Citizens first conceived the plan in 1994 when it applied for approval from the Public Utilities Commission. Citizens then spent three years getting its plan approved, convincing the Commission, allegedly with devious intent, that Citizens' goal was to proliferate solar water heaters on Kauai, when in actuality Citizens intended the opposite. Citizens then implemented the program, starting in 1998, and kept maximum approved installation prices artificially low for six years. It appears the

old rebate program ended in 2004 and was replaced with a program where KIUC gives an $800 rebate for any residential homeowner's purchase of a solar water heater through an approved contractor, without an individualized evaluation of the cost-effectiveness.

Let us examine Plaintiff's argument. If the Energy Wise Program had not existed since 1998, there would still be a solar hot water heater installers market on Kauai and a certain number of solar hot water heaters would be installed at prices customers were willing to pay and at prices the installers were willing to sell. The effect of the program was not a flat, across the board subsidy, but rather a subsidy in those situations where energy savings would be significant. In those cases the net prices to the consumers would probably be lower, but in no event would be higher than the prices that would have been obtained in the absence of the program. Therefore, in every case affected by the program we can say that either the program had absolutely no effect on the transaction or that the program resulted in a net lower price to the consumer than would have been charged in the absence of the program. The economic benefit of any rebate or below market financing would be shared in some fashion by the consumers and the installers. The gravamen of Plaintiff's complaint is that he received none of the economic benefit from the program; his profit (or loss) would have to come from the remaining unaffected portion of the market. We can say, then, that the program was, in general terms, not harmful and most likely economically beneficial to the solar energy installation market.

Based on the evidence, it cannot be said that the program affected pricing in the entire solar water heater installation market. Nor can it be said that the program, when it did lead to lower prices, made the installation so unprofitable that no installer (or no installer having a cost structure or profit expectation at or about the market norm) would or could participate.

Plaintiff's theory fails to make sense economically in several respects. First, it is implausible that Defendants would attempt to suppress the installation of solar water heaters on Kauai by subsidizing solar water heaters. If the subsidy can be said to lower the price of solar water heaters, lower prices would lead to a proliferation of the heaters. Lower prices and suppression of the number of sales of solar hot water heaters cannot exist in the same economic universe.

Second, it is unlikely that the affiliated contractors would voluntarily agree to conspire with Defendants to maintain prices of installations at levels below dealer cost. Antitrust conspirators generally act in economic self interest and generally do not take action that will lead to economic loss or insolvency.

Third, there is no evidence that Defendants have sold or installed solar water heaters or intended to enter that line of business after driving Plaintiff Lucas and the other installers out of business, i.e. the supposed rationale of the *Matsushita* case.

Fourth, again along the lines of the *Matsushita* case, the only way Defendants could drive Plaintiff Lucas and the other installers out of business would be to reduce prices to levels at which none of the installers could make money. Essentially Defendants would have to flood the market with solar water heaters, which would run contrary to Plaintiff's theory of Defendants' ultimate goal of fewer solar heaters on Kauai. Because of the way subsidies and rebates operate, Defendants did not have the power to reduce prices to such a level without violating the PUC order. There is no evidence of violation of the PUC order or intent to do so.

## ANALYSIS

### CLAIMS UNDER THE SHERMAN ANTITRUST ACT

Plaintiff bases the federal claims in his complaint on Sections 1 and 2 of the Sherman Antitrust Act. Section 1 concerns contracts, combinations and conspiracies in restraint of trade. 15 U.S.C. § 1. Section 2 addresses monopolization. 15 U.S.C. § 2. Section 1 prohibits, inter alia, price-fixing, of which there are four types, group boycotts, and tying arrangements. *Arizona v. Maricopa County Med. Soc.,* 457 U.S. 332, 344 n. 15, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (citation omitted). Section 2 prohibits, inter alia, monopolization, attempted monopolization, and conspiracy to monopolize. *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 786 n. 15, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993).

Plaintiff does not specify which categories of prohibited conduct Defendants are accused of undertaking, nor does he discuss the elements he must prove or the legal standard that will be used to evaluate Defendants' conduct. Plaintiff's Complaint and Memorandum in Opposition to Summary Judgment refer generally to price-fixing. Plaintiff, however, does not state which of the four types of price-fixing he is alleging.[1] Arguably the allegation of price-fixing is based upon Defendants' establishment and operation of the Energy Wise Program and the solar energy device installers who participate in the program and comply with its rules and regulations, including pricing restrictions. Plaintiff is similarly vague on which category of conduct is alleged pursuant to Section 2 of the Sherman Act.

For the reasons discussed below, summary judgment must be GRANTED for Defendants on Plaintiff's claims pursuant to the Sherman Act.

### A. Sherman Act Section 1

Section 1 of the Sherman Act provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce...is declared to be illegal." 15 U.S.C. § 1.

#### 1. Contract, Combination or Conspiracy

Section 1 prohibits price-fixing arrangements between two or more actors. There are four types of price-fixing arrangements: horizontal minimum price-fixing, horizontal maximum price-fixing, vertical minimum price-fixing, and vertical maximum price-fixing. *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 988 (9th Cir.2000).

■ The Sherman Act Section 1 does not prohibit an individual business, acting alone, from unilaterally setting its own prices, even if the prices are artificially high or artificially low. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)("It is not enough that a single firm appears to 'restrain trade' unreasonably."); *Fisher v. City of Berkeley,* 475 U.S. 260, 266, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986); *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)("[t]here must be evidence that tends to exclude the possibility" of independent action); *Holsum Bakery, Inc.,* 146 F.3d at 1065; *Richards,* 810 F.2d at 902 (Section 1 does not prohibit independent action). The Sherman Act only prohibits concerted action among separate entities to fix prices.[2] *Id.*

---

1. Plaintiff clearly alleges maximum price-fixing, which is setting the maximum price that can be charged for a product. It is unclear whether Plaintiff alleges vertical maximum price-fixing or horizontal maximum price-fix-

ing. The importance of the distinction is discussed below.

2. Courts use the terms "contract" "combination" and "conspiracy" interchangeably to describe an agreement between two or more

■ Plaintiff, in order to succeed on a vertical maximum price-fixing claim, must prove that there is a conspiracy or a concerted action between two or more actors to fix prices and that the price-fixing conspiracy is illegal pursuant to the applicable legal standard.[3] *Fisher*, 475 U.S. at 266, 106 S.Ct. 1045; *Mularkey v. Holsum Bakery, Inc.*, 146 F.3d 1064, 1065 (9th Cir. 1998). It is not enough that Defendants had a program and recruited the affiliated contractors, dictated prices to the contractors, or even coerced the contractors into selling at prices determined by Defendants. *Fisher*, 475 U.S. at 266, 106 S.Ct. 1045; *Holsum Bakery, Inc.*, 146 F.3d at 1065; *Toscano v. PGA Tour, Inc.*, 70 F.Supp.2d 1109, 1115 (E.D.Cal.1999)("the existence of a contract between a party who announces his terms and a party who acquiesces in them does not, without more, give rise to an inference of concerted action under § 1.")[4]

In *Monsanto*, the plaintiff alleged a conspiracy engineered by Monsanto to fix the resale price its distributors charged for its herbicides. The Court held that the fact Monsanto terminated the plaintiff in response to complaints from other distributors was not, by itself, enough to show that there was an agreement between Monsanto and the distributors to fix resale prices. *Monsanto*, 465 U.S. at 763, 104 S.Ct. 1464. Evidence of a "meeting of minds" and concerted action to fix prices was necessary. *Id.* at 765, 104 S.Ct. 1464. In *Fisher*, the City of Berkeley was alleged to have headed a price-fixing conspiracy in the residential rental market. *Fisher*, 475 U.S. at 265, 106 S.Ct. 1045. The Supreme Court found that there was no conspiracy to fix lower rents in Berkeley where landlords were forced to charge lower rents by a city ordinance. *Id.* at 266–67, 106 S.Ct. 1045.

In *Holsum Bakery*, the Ninth Circuit Court of Appeals held that there is no conspiracy where a manufacturer of a product dictates prices at which a distributor must sell the product: "[Plaintiffs] argue that they have evidence that 'Holsum dictated prices to its distributors,' and 'threatened them if the prices were not followed.' Even if true, this allegation points only to *unilateral* conduct, which is not prohibited by § 1." *Holsum Bakery, Inc.*, 146 F.3d at 1065 (emphasis in original).

■ The only evidence Plaintiff has submitted in support of a conspiracy is evidence that Defendants placed limits on the price of solar water heaters sold with rebates through the Energy Wise Program and that Plaintiff had no say in the process. (Pl.'s Concise Statement, Lucas Decl. ¶¶ 9, 12; Ex. N.) The evidence does not show anything more than unilateral

---

actors to restrain trade. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455 (11th Cir.1991).

3. Plaintiff must also prove that the conspiracy affects interstate commerce. 15 U.S.C. § 1. The Court assumes without deciding that the interstate commerce element is met.

4. *Toscano* addressed conduct evaluated under the Rule of Reason standard. When conduct that is per se illegal is alleged, a contract alone "may give rise to an inference of concerted action under § 1 if the agreement was part of a tying arrangement." 70 F.Supp.2d at 266 n. 6. The contracts between the contractors and Defendants in the present case do not raise a genuine issue of material fact as to concerted action for three reasons. First, the Rule of Reason applies to the alleged price-fixing conspiracy, as will be discussed below. Second, Plaintiff does not allege that the contracts are tying agreements. Third, even if the per se illegality rule applied, the *Matsushita* standard is applicable. There must be stronger evidence of concerted action to fix prices than mere inferences because the alleged conspiracy does not make economic sense.

action on the part of Defendants and acquiescence by some installers.

The first part of the Section 1 test, concerted action, has not been met.

## 2. The Rule of Reason Standard

■ There are four types of price-fixing arrangements. Plaintiff has alleged that Defendants participated in maximum price-fixing, but has not specified whether he is alleging horizontal or vertical price-fixing. The difference is significant, because horizontal maximum price-fixing is per se illegal if "contract, combination or a conspiracy" can be proven. *Knevelbaard Dairies,* 232 F.3d at 988. Vertical maximum price-fixing, if proven, is only illegal if the price-fixing fails to satisfy the "Rule of Reason" standard. *Id. State Oil Co. v. Khan,* 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *Holsum Bakery, Inc.,* 146 F.3d at 1065 n. 1. Under the Rule of Reason standard, a restraint of trade is lawful if the legitimate justifications for the restraint on trade outweigh any anticompetitive effects. *Jack Russell Terrier Network of N. Cal. v. American Kennell Club. Inc.,* 407 F.3d 1027, 1033 n. 13 (9th Cir.2005); *United States v. LSL Biotechnologies,* 379 F.3d 672, 697 (9th Cir.2004).

The alleged maximum price-fixing arrangement in this case appears to be a vertical arrangement. The Rule of Reason standard applies. Horizontal price-fixing involves arrangements between competitors at the same level of the market. Vertical price-fixing concerns businesses that operate at different levels, such as a wholesale distributor and a retailer. *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 136, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Business Elec. Corp. v. Sharp Elec, Corp.,* 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). "A restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement." *Business Elec.*

*Corp.,* 485 U.S. at 730 n. 4, 108 S.Ct. 1515. The price-fixing arrangement alleged in this case is not horizontal as a matter of law, as Defendants do not sell solar power water heaters and are not in competition with the affiliated contractors. There is no allegation that the affiliated contractors have conspired with each other, only that each has conspired with Defendant, a noncompetitor.

■ Plaintiff's Section 1 vertical price-fixing claim against Defendants fails to meet the Rule of Reason test.

### a. Harm to Competition

The undisputed facts show that there was no harm to competition due to the alleged conspiracy. The undisputed evidence shows that Defendants' price-limiting policy had an ostensible goal of giving price incentives for the installation of water heaters only when the energy savings justified the price of the heater and only to the extent of such energy savings. The evidence indicates that Defendants' actions did not decrease and may have increased the number of solar water heaters sold on Kauai, lowered prices for some installations, and created more robust competition by increasing the opportunities to make sales. There is no evidence that Defendants met or will ever meet their alleged goal of suppressing the sale of solar water heaters and destroying competition, despite claims by Plaintiff that he personally suffered injury and does not sell as many heaters. *See NYNEX Corp.,* 525 U.S. at 135, 119 S.Ct. 493 (plaintiff must "allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself."). There is nothing in the record to indicate what percentage of the Kauai solar water heater market was affected by the program. When Defendants concluded that some installations would not result in energy savings, in theo-

ry, at least, Plaintiff's opportunity to make sales to that segment of the market that Defendants were unwilling to subsidize was unaffected by the program. The Court does not doubt that Plaintiff's profits suffered due to the lower prices. Individual businesses are often harmed when competitors beat their prices in the course of vigorous competition. *Kentmaster Mfg. Co. v. Jarvis Prod. Corp.*, 146 F.3d 691, 695 (9th Cir.1998). Robust competition is likely to lead to lower prices which will harm some individual competitors and may lead to the exit of competitors from the industry due to an inability to compete.

### b. Market Power

■ A finding of the absence of harm under the Rule of Reason test for Section 1 of The Sherman Act makes it unnecessary to reach the issue of market power. It is instructive, however, to discuss the market power issue in the context of this case. Under the Rule of Reason, Plaintiff must prove that the Defendants have market power in the relevant market.[5] *Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir.1978); *L.A.P.D. Inc. v. General Elec. Corp.*, 132 F.3d 402, 405 (7th Cir. 1997)("proof of market power is essential; without it, any case under the Rule of Reason collapses"); *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 310 (5th Cir.1997); *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 59 (2nd Cir.1997). Market power is the ability of a single seller to raise price and restrict output and is usually inferred by a significant market share. *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 464, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

■ Market share is the starting point for addressing market power and monopoly power. *Oahu Gas Serv., Inc. v. Pacific Res., Inc.*, 838 F.2d 360, 366 (9th Cir.1988); *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997)("Courts generally require a 65% market share to establish a prima facie case of market power.") A high market share may raise an inference of market power, but is not necessarily sufficient by itself to demonstrate market power. *Oahu Gas Serv. Inc.*, 838 F.2d at 366; *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1043 (9th Cir.2005). "[I]t is not market share that counts, but the ability to *maintain* market share." *United States v. Syufy Enter.*, 903 F.2d 659, 665–66 (9th Cir.1990)(emphasis in original). Courts evaluate barriers to entry into the market, whether natural or artificial, to determine the ability to maintain market share. *Id.*

Defendants' program divided up the solar hot water heater installation market into two segments: residents that could qualify for the program based on energy savings and those who could not. Plaintiff has not shown any evidence of the market share of Defendants' affiliated contractors nor evidence of barriers to entry into the market. There is no evidence that the market share of the affiliated contractors is high or low, if the affiliated contractors have a 5% market share or a 95% market share in solar water heaters on Kauai.

The evidence Plaintiff has produced suggests that there are competitors to the affiliated contractors and that the market share of the affiliated contractors is not necessarily high. Exhibit 2 to Plaintiff's concise statement is an affidavit from Marc Anthony, the president of Pacific Solar, "one of the largest solar water heating companies in the State." Pacific Solar is not an affiliated contractor and sells its solar water heaters outside the Energy

---

5. The relevant geographic and product markets are assumed to be the market for solar water heaters as a substitute for conventionally generated electrical power on the island of Kauai.

Wise Program. Plaintiff has submitted the affidavits of several homeowners on Kauai who purchased solar water heaters, but not through the Energy Wise Program. (Pl.'s Concise Statement, Ex. 4, 6, 11.) The affidavits indicate that the affiliated contractors have never encompassed the entire market.

Plaintiff also claims that Defendants qualified "as few people as possible" for the rebate program. (Pl.'s Memo. in Opp'n at 19.) Defendants only possessed the power to affect prices directly for the water heaters for which they gave rebates. If there is truth to Plaintiff's own claim that few customers were actually qualified for rebates, then Defendants had no significant market share, or market power.

There is another dimension to the market power issue. When courts speak of the power to raise prices and restrict output, generally two other conditions are present; unlawful behavior for the goal of increased profits to the market participant who has raised prices, made possible by barriers to entry into the market. Here, Defendants neither gained or lost anything economically. Additionally, while there are barriers to entry to Defendants' primary business of traditional generation of electrical energy, there appears to have been no barriers to entry to the business of solar energy installation on Kauai.

There is no showing that Defendants possessed market power. Plaintiff cannot succeed on his claim pursuant to Section 1 of the Sherman Act if he does not prove market power.

### 3. *Summary Judgment of Section 1 Claims*

Summary judgment in favor of Defendants is appropriate on Plaintiff's Sherman Act Section 1 claims. The undisputed facts fail to demonstrate the existence of a "contract, combination or conspiracy." Summary judgment would be appropriate even if there were some sort of action in concert. There is no genuine issue of material fact as to the two required components of any Rule of Reason analysis: harm to competition and market power.

### B. Sherman Act Section 2

Section 2 of the Sherman Act prohibits monopolization, attempted monopolization, and conspiracies or combinations to monopolize. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 454, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). It is unclear whether Plaintiff is alleging monopolization, attempted monopolization, conspiracy to monopolize, or all three against Defendant. Summary judgment is appropriate for Defendants on all three offenses.[6]

### 1. *Monopolization and Attempted Monopolization*

Monopolization and attempted monopolization have different elements, but there are two common elements to both: 1) either possession of monopoly power or a probability of success in achieving monopoly power, and 2) anticompetitive or predatory conduct to achieve or maintain the monopoly power.[7] *Eastman*

6. The Court assumes, without deciding, that a Section 2 claim can be successfully alleged against entities, like Defendants, who are not direct participants in the relevant product market. Defendants have never directly sold or directly profited from the sale of solar water heaters. The Supreme Court has held that there are situations where an indirect participant in a market, such as a non-profit trade association, can nonetheless monopolize a market. *See American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982).

7. The elements of monopolization are 1) possession of monopoly power; and 2) the acquisition, use, or maintenance of that power for anticompetitive or predatory purposes. *As-*

*Kodak Co.*, 504 U.S. at 481, 112 S.Ct. 2072; *Spectrum Sports, Inc.*, 506 U.S. at 456, 113 S.Ct. 884; *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595–96, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). When attempted monopolization is alleged, the anticompetitive conduct must be with the intent to monopolize. *Id.* Defendants do possess a lawfully granted monopoly for the traditional generation and distribution of electrical power on the island of Kauai. That fact has little, if anything, to do with the issue of monopolization in this case. Plaintiff has standing as a competitor in this solar hot water heater installation market on the island of Kauai to raise claims of injury to competition in that market. Defendants have the power and have exercised the power to affect the number of units sold and pricing in a portion of the solar hot water installation market on Kauai, but Defendants are not competitors in that market. Defendants do not sell or install solar hot water heaters, nor is there evidence that they ever intend to enter that market. It is clear that Defendants' program has not caused economic injury to the solar hot water heater installation market in any manner that violates the antitrust law.

### a. Monopoly Power

A plaintiff must show either the possession of monopoly power or "a dangerous probability of achieving monopoly power" in order to succeed on a claim for monopolization or attempted monopolization. *Aspen Skiing Co.*, 472 U.S. at 595–96, 105 S.Ct. 2847; *Spectrum Sports, Inc.*, 113 S.Ct. at 890–91. Plaintiff has not raised a genuine issue of material fact as to monopoly power.

pen Skiing Co., 472 U.S. at 595–96, 105 S.Ct. 2847.
The elements of attempted monopolization are 1) defendant has engaged in predatory or anticompetitive conduct, 2) with the specific

"Monopoly power under § 2 requires, of course, something greater than market power under § 1." *Eastman Kodak Co.*, 504 U.S. at 481, 112 S.Ct. 2072.

For the reasons stated in the above, including the discussion of Plaintiff's claims pursuant to Section 1 of the Sherman Act, Plaintiff has not raised a genuine issue of material fact as to the existence of or the probability of achievement of market power or monopoly power. Summary judgment must be granted for Defendants on Plaintiff's monopolization and attempted monopolization claims.

### b. Anticompetitive Conduct

Having a monopoly, by itself, does not violate Section 2 of the Sherman Act. *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C.Cir.2001). A monopolist or attempted monopolist must also engage in exclusionary or predatory acts that harm competition. *Id.*

Plaintiff has not raised a genuine issue of material fact, for the reasons stated in the discussion of Plaintiff's Sherman Act Section 1 claim, that Defendants' actions harmed rather than furthered competition in the solar water heater market.

### 2. *Conspiracy to Monopolize*

The elements of conspiracy to monopolize are 1) existence of a combination or conspiracy to monopolize, 2) an overt action in furtherance of the conspiracy, 3) the specific intent to monopolize, and 4) causal antitrust injury. *Paladin Assoc., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir.2003). A plaintiff must show that the defendant's conduct harmed competition to show "antitrust injury." *Id.*

intent to monopolize, and 3) there is a dangerous probability defendant will achieve monopoly power. *Spectrum Sports*, 506 U.S. at 456, 113 S.Ct. 884.

■ Summary judgment for Defendants is appropriate, for the reasons discussed above, on the issues of the existence of a conspiracy between Defendants and the affiliated contractors, and as to harm to competition.

## C. Price Discrimination

Plaintiff argues that summary judgment is inappropriate as Defendants have engaged in price discrimination in violation of the Robinson–Patman Act, 15 U.S.C. § 13. Plaintiff, however, has not alleged a violation of the Robinson–Patman Act in his complaint, nor has he moved to amend his complaint.

Summary judgment would be appropriate even if Plaintiff had alleged price discrimination in his complaint. Plaintiff's claim of unlawful price discrimination is based upon the evidence that different prices were charged to different customers for the same water heaters. Price discrimination, however, is not illegal by itself. *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1271 (3rd Cir.1995). A movie theater does not violate the antitrust laws by charging senior citizens, students and other customers different prices for the same movie. The antitrust laws condemn price discrimination "only to the extent that [it] threatens to injure competition." *Kentmaster Mfg. Co.*, 146 F.3d at 695. Defendants discriminate as to the amount of rebates given and as to whether rebates are given at all. Defendants' actions have not been shown to harm competition.

## D. State Action Doctrine

It is unnecessary to decide whether state action immunity protects Defendants from antitrust liability. Plaintiff has not made a case for violation of the antitrust laws. *Fisher*, 475 U.S. at 270, 106 S.Ct. 1045 (unnecessary to decide state action immunity where conduct did not violate antitrust laws).

## STATE LAW CLAIMS

Plaintiff has alleged Hawaii law claims for violation of state antitrust laws, defamation, and punitive damages. Plaintiff's state law claims also result in summary judgment for Defendants.

## A. State of Hawaii Antitrust Laws

The State of Hawaii versions of Sections 1 and 2 of the Sherman Act, H.R.S. §§ 480–4, 480–9, mirror their federal counterparts. *Island Tobacco Co., Ltd. v. R.J. Reynolds Tobacco Co.*, 63 Haw. 289, 627 P.2d 260, 267–68 (1981), *overruled on other grounds by Robert's Haw. Sch. Bus. Inc. v. Laupahoehoe Trans. Co., Inc.*, 91 Hawaii 224, 982 P.2d 853 (Haw.1999).

Plaintiff has failed to raise a genuine issue of material fact on his state law antitrust claims for the same reasons discussed above as to his federal law claims. *Id.* at n. 7; *Hawaii v. Gannett Pac. Corp.*, 99 F.Supp.2d 1241, 1248 (D.Haw.1999)(no need for separate analysis of claims pursuant to federal antitrust laws and State of Hawaii antitrust laws). Further, any claim Plaintiff raises pursuant to H.R.S. § 480–2 also fails as Plaintiff is not a consumer. *Dash v. Wayne*, 700 F.Supp. 1056, 1059 (D.Haw.1988). Summary judgment is GRANTED for Defendants on Plaintiff's state antitrust claims.

## B. Defamation

The Court previously dismissed the defamation claim in Plaintiff's first complaint for failing to allege a false and defamatory statement. See *Lucas v. Citizen Commc'n., et al.*, Civil No 03–00295 HG–LEK, Order, October 22, 2003. Plaintiff amended his complaint as to the defamation claim.

■ Plaintiff must prove four elements to succeed on a defamation claim: "(a) a

false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher [actual malice where the plaintiff is a public figure]; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Gold v. Harrison*, 88 Hawai'i 94, 962 P.2d 353, 359 (1998).

 Plaintiff has provided evidence of only one allegedly defamatory statement by KIUC, although the Complaint states that both defendants made defamatory statements. Plaintiff has presented evidence that a representative of KIUC told a potential customer of Plaintiff's that Plaintiff was no longer part of the Energy Wise Program because he had overcharged people. (Pl.'s Concise Statement Ex. 11.). There is no specific evidence regarding who made the statement (other than that it was a KIUC employee) when the statement was made, or the context in which the statement was made.

The statement is also not defamatory because it is true by Plaintiff's own admission: "I sometimes asked customers to pay me above the maximum price allowed by KE." (Pl.'s Concise Statement, Lucas Decl. ¶ 13.) "Truth is an absolute defense to defamation." *Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd.*, 100 Hawai'i 149, 58 P.3d 1196, 1220 (2002)(internal quotation and citations omitted). Summary judgment is GRANTED for Defendants on Plaintiff's defamation claim.

Summary judgment is independently appropriate for Citizens as Plaintiff has not alleged a defamatory statement on the part of Citizens or a Citizens employee. Plaintiff's argument that KIUC could only have learned the information that is the subject of the alleged defamatory statement from Citizens fails for two reasons. First, the inference that Citizens must have made a defamatory statement to KIUC regarding Plaintiff is not mandated by the facts in the record. Any number of individuals other than Citizens, including competitors and customers of Plaintiff, could have communicated the information to KIUC. Second, KIUC is the corporate successor to Citizens, both as the corporate employer of the employees possessing the information and also as the successor corporate sponsor of the Energy Wise Program. If the information did come from Citizens, Plaintiff has not overcome the prima facie defense of intra-corporate communication qualified privilege in order to hold Citizens liable for defamation. *Cweklinsky v. Mobil Chem. Co.*, 364 F.3d 68, 73 (2nd Cir.2004).

## C. Punitive Damages

Count IV of the complaint is for punitive damages. Summary judgment is granted for Defendants on all substantive counts. Plaintiff is not entitled to punitive damages.

### CONCLUSION

In accordance with the foregoing, it is HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED as to all counts of the First Amended Complaint.

THE CASE IS DISMISSED.

IT IS SO ORDERED.